UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

SEIU HEALTH CARE MICHIGAN,

       Plaintiff,

v.

RICHARD SNYDER, in his official capacity
as Governor of Michigan; OLGA DAZZO, in
her official capacity as Director of the
Michigan Department of Community Health;
and ANDY DILLON, in his official capacity
as Michigan State Treasurer,

       Defendants.

Case No.  12-12332

Honorable Nancy G. Edmunds

_____/

**OPINION AND ORDER GRANTING PLAINTIFF'S MOTION FOR A TEMPORARY
RESTRAINING ORDER AND PRELIMINARY INJUNCTION**

This matter comes before the Court on Plaintiff SEIU Healthcare Michigan's motion

for temporary restraining order and preliminary injunction.  For the reasons set forth below,

Plaintiff's motion is GRANTED.

**I.**    **Facts**

      **A.**    **The Michigan Quality Community Care Council**

In 2004, the Michigan Department of Community Health ("DCH"), a state agency,

and the Tri-County Aging Consortium created the Michigan Quality Community Care

Council ("MQC3") through an interlocal agreement ("Agreement").  (Compl. ¶ 15.)  This

Agreement and the creation of MQC3 was to address the "workforce crisis due to

1

significant problems recruiting and retaining paraprofessionals to serve Michigan seniors and residents with disabilities in their homes and the community." (Agreement, Recitals A.) The Agreement states that it does not create and is not intended to create any direct or indirect third-party beneficiaries. (Agreement § 3.07.)

The Agreement gives MQC3 authority for provider-related "payroll management and disbursement services," including completion and submittal of providers' employment and tax forms, withholding and depositing providers' state and local taxes, ensuring compliance with federal and state minimum wage laws, and generating and issuing paychecks. (Agreement § 6.05.) The Agreement also authorizes MQC3 "the right to bargain collectively and enter into agreements with labor organizations." (*Id.* at § 6.11.)

Section 1.27 of the Agreement provides for a Transfer Agreement between DCH and Tri-County Aging Consortium and MQC3 that would establish the terms and conditions of DCH and Tri-County Aging Consortium's transfer of program functions and/or funding to MQC3. On December 21, 2004, DCH and MQC3 entered into a Transfer Agreement in which DCH agreed:

> In order to assure smooth and efficient payment of fees to individual providers on behalf of Consumers in accordance with the requirements of the Home Help Program, the Department will continue the operation of the Provider payroll processing service related to the Home Help Program under 1979 AACS, R 400.1101 to 400.1107 and the IRS Code Section 3504 and Internal Revenue Service Revenue Procedure 70-6.

(Transfer Agreement, IV, ¶ 2.)

On March 29, 2012, DCH sent Tri-County Aging Consortium a notice of intent to withdraw from the Interlocal Agreement. The Tri-County Aging Consortium was unwilling to agree to an earlier termination of the Interlocal Agreement by "joint action of the Parties"

as provided in § 8.01.  (Def. Resp. ¶ 40.)  DCH then followed the procedures in § 8.02 of the Agreement, which requires DCH and the Tri-County Aging Consortium to meet "to discuss and attempt to resolve any issue of concern."  (Def. Resp. ¶ 41.)  The Tri-County Aging Consortium insisted that the Interlocal Agreement not be terminated any earlier than the one-year procedure required under § 8.02(3).  (*Id.* at ¶ 42.)  On May 11, 2012, DCH sent the Tri-County Aging Consortium a Notice to Terminate the Agreement as required under § 8.02(3).  (Farrell Aff. ¶ 20, Ex 4.)  Based on this, the Interlocal Agreement will terminate on approximately April 11, 2013.  (Farrell Aff. ¶ 21).

### B.    The Union

In 2003, the workers paid by the State to provide in-home care as part of the Home Help Program began a campaign to organize a union.  (Allison Decl. ¶ 8.)  Between 2003 and 2005, more than 20,000 providers signed authorization cards to select Plaintiff as their collective bargaining representative and Plaintiff presented MQC3 with those cards.  (*Id.*)

The Michigan Employment Relations Commission ("MERC") is the state agency responsible for administering Michigan's Public Employment Relations Act ("PERA"). MERC decided that given this showing of support for Plaintiff to act as a representative for the providers, MERC determined that a union-representation election was justified under PERA.  (Allison Decl. ¶ 10.)  Under PERA, public employees may form unions.  Mich. Comp. Laws § 423.209.  A public employee is:

> A person holding a position by appointment or employment in the government of this state, in the government of 1 or more of the political subdivisions of this state, in the public school service, in a public or special district, in the service of an authority, commission, or board, or in any other branch of the public service, subject to [certain] exceptions.

Mich. Comp. Laws § 423.201(e).

3

In March 2005, MERC conducted a state-supervised, mail-ballot to determine whether Plaintiff should be recognized as the providers' exclusive collective bargaining representative for purposes of bargaining with MQC3.  (*Id.* ¶ 11.)  Official ballots with postage-paid return envelopes were mailed to 42,763 Home Help Providers.  (Farrell Aff. ¶ 5.)  Of the ballots mailed out, 8,500 ballots were returned; 7,000 were "yes" votes, 1,000 were "no" votes, and 500 were voided/not valid.  (*Id.* at ¶¶ 6-7.)  In order for Plaintiff to be recognized as the collective bargaining representative, 51% of the returned votes had to be "yes" votes.  Because the ballots did not mention this fact, Cynthia Farrell speculates that it is possible that many home help providers not in favor of the union failed to turn in ballots under the mistaken impression that they would count as 'no' votes.  (Farrell Aff. ¶ 8.)

On April 19, 2005, the Michigan Employment Relations Commission ("MERC") officially certified Plaintiff as the collective bargaining representative of the more than 41,000 providers who the State of Michigan pays to provide home health care services to elderly and disabled individuals through Michigan's Home Help Program.  (Compl. ¶ 8.)

### C.    The Collective Bargaining Agreement

In 2006, Plaintiff and MQC3 entered into a Collective Bargaining Agreement ("CBA"). (Compl. ¶ 22.)  None of the State Defendants are named as parties in the CBA.  In 2009, MQC3 and Plaintiff entered into a new CBA, which has an expiration date of September 20, 2012.  At the time the CBA was negotiated, State Defendants had representatives on the MQC3 board. (Farrell Aff. ¶ 11.)

The CBA states that Plaintiff "is the sole and exclusive collective bargaining representative under the Public Employment Relations Act of all providers who provide

personal assistance services to elderly persons and persons with disabilities through the

MQCCC under the Michigan Home Help Program and other programs and personal

assistance services undertaken by the MQCCC," excluding certain employees.  (CBA, Art.

1.)

The CBA describes union rights and requires MQC3 to deduct union dues or agency

fees from the wages of Providers.  Specifically, the CBA provides:

> 1. [Plaintiff] and the MQCCC agree dues deduction is an internal process that
> must be preserved. However the parties want to clearly set forth in writing the
> dues calculation method determined by [Plaintiff]. . . .
> * * *
> 2. Upon receipt from a Provider of an individual written authorization . . .,  the
> MQCCC shall deduct from the wages, due that Provider on a monthly basis,
> the sum specified in the authorization(s) and remit same to [Plaintiff] on a
> monthly basis. To be effective, the authorization(s) must be revocable at the
> Provider's option.

(CBA, Art 4, E.)  The CBA permits providers to pay union dues and become full

members of Plaintiff's organization or to decline full membership and pay Plaintiff a

uniformly assessed fair share/agency fee, which is substantially lower than the full union

dues.  (Compl. ¶ 27.)  Of the over 41,000 providers, only approximately 2% have

elected not to be full members.  (Compl. ¶ 28.)

To implement the payment of dues and fees, MQC3 transmits data to DCH

indicating the amounts to be withheld from each provider and directs DCH to withhold

those amounts.  (Compl. ¶ 29.)  On a monthly basis, DCH process payroll, withholds the

dues and fees, then transmits those dues and fees to MQC3, which then transmits

those dues and fees to Plaintiff.  (Compl. ¶ 29.)

The CBA states, "The provisions of this Contract, and any executed Letters of

Understanding, shall supersede all prior agreements and constitute the sole source of

5

any rights which may be asserted under this Agreement." (CBA, Art 14 ¶ 1.) On October 15, 2009, MQC3 and Plaintiff extended the CBA so that it would be in effect until November 15, 2012. On April 9, 2012, MQC3 and Plaintiff signed an agreement extending the CBA to February 28, 2013.

The Michigan Department of Human Services authorizes the payment to the client served and the home help provider as a dual party check. (Farrell Aff. ¶ 23.) DCH is the filing agent to the IRS on behalf of the home help client in which FICA taxes are withheld from the check and submitted quarterly to the IRS. (Farrell Aff., ¶ 24.) DCH issues W-2s to home help providers on behalf of the home help client. (Farrell Aff., ¶ 25).

DCH Does not consider itself to be the employer of home help providers because this would leave the State open to paying all those home help providers as state employees. (Farrell Aff., ¶ 26).

### D.    The Bill

On March 22, 2012, the Michigan Senate passed Senate Bill 1018 and the Michigan House passed it on March 28, 2012. On April 9, 2012, Governor Snyder signed Senate Bill 1018 ("the Bill") into law as Public Act 76 and it became effective on April 10, 2012. (Compl. ¶ 4.) The Bill amended the definition of "public employee" in Michigan Public Employee Relations Act to exclude workers "employed by a private organization or entity . . . who receive a direct or indirect government subsidy in [their] private employment." Mich. Comp. Law § 423.201(e)(i).

Additionally, the statute was also amended to state, "This provision shall not be superseded by any interlocal agreement, memorandum of understanding, memorandum

6

of commitment, or other document similar to these." *Id.* The Bill provides that it is retroactive and that public employees cannot recognize bargaining units consisting of such individuals and any bargaining unit formed or recognized in violation of the Bill's provisions is invalid and void. (Compl. ¶ 31.) This renders Plaintiff as a bargaining unit "null and void" and prohibits public officials from recognizing their union and abrogates Plaintiff's existing collective bargaining agreement with MQC3. (Compl. ¶ 4.)

On May 24, 2012, the Michigan Attorney General issued an opinion letter stating that Senate Bill 1018 must be given immediate effect, notwithstanding the existing CBA. (Compl. ¶ 5.) The opinion letter also stated that the Bill precludes any further deduction of dues for providers within Plaintiff's bargaining unit because under the new law, "the providers are not public employees, regardless of the terms of the existing interlocal agreement, the collective bargaining agreement, or any other agreement."

On May 25, 2012, DCH stated that pursuant to the Attorney General's opinion letter, it would disregard the CBA and will not deduct union dues and agency fees from providers' paychecks going forward. (Compl. ¶¶ 5, 33.)

## II.   Standard

The availability of injunctive relief is a procedural question that is governed by federal law. *Southern Milk Sales, Inc. v. Martin*, 924 F.2d 98 (6th Cir. 1991). The Sixth Circuit has held that a court must consider four factors in deciding whether to issue a preliminary injunction:

1.   whether the movant has shown a strong or substantial likelihood of success on the merits;

2.      whether the movant has demonstrated irreparable injury;

3.      whether the issuance of a preliminary injunction would cause substantial harm to others; and

4.      whether the public interest is served by the issuance of an injunction.

*Parker v. U. S. Dept. of Agric.*, 879 F.2d 1362, 1367 (6th Cir. 1989).

The foregoing factors should balanced.  *In re DeLorean Motor Co.*, 755 F.2d 1223, 1229 (6th Cir. 1985).  Where the three factors other than the likelihood of success all strongly favor issuing the injunction, a district court is within its discretion in issuing a preliminary injunction if the merits present a sufficiently serious question to justify a further investigation.  *Id.* at 1230.  Alternatively, the court may also issue a preliminary injunction if the movant "at least shows serious questions going to the merits *and* irreparable harm which decidedly outweighs any potential harm to the defendant if an injunction is issued."  *Frisch's Rest., Inc. v. Shoney's Inc.*, 759 F.2d 1261, 1270 (6th Cir. 1985) (citations omitted).

## III.   Analysis

Plaintiff argues that it should be granted a preliminary injunction because the four factors to be considered and weighed by the Court are overwhelmingly in Plaintiff's favor.  Defendants disagree.

### A.      Likelihood of Success on the Merits

Plaintiff argues that the CBA is a valid contract and that Senate Bill 1018 violates the Contract Clause of the United States Constitution.  The Contract Clause provides, "No States shall . . . pass any . . . law impairing the Obligation of Contracts . . . ."  U.S. Constitution, Art. I, § 10.  Plaintiff argues that it has a claim under 42 U.S.C. §1983,

8

which provides a cause of action against any persons acting under color of law who

cause "the deprivation of any rights, privileges, or immunities secured by the

Constitution and laws."

Defendants do not contest that Senate Bill 1018 explicitly states that it is

retroactive and that public employees cannot recognize bargaining units consisting of

such individuals and any bargaining unit formed or recognized in violation of the Bill's

provisions is invalid and void.  Defendants argue, however, that Plaintiff did not have a

valid contract and therefore Senate Bill 1018 is not in violation of the Contract Clause.

Defendants argue that an injunction is not proper because: (1) home help providers did

not qualify as public employees under PERA, so the CBA is *void ab initio*; (2) the

Interlocal Agreement exceeded the scope of the Urban Cooperation Act, so the CBA is

*void ab initio*; (3) the new law merely clarified a possible ambiguity in PERA that had

been exploited in bad faith by Plaintiff; (4) the new law does not substantially impair the

CBA; and (5) MQC3 is a necessary party that Plaintiff failed to join.

### 1.    Home Help Providers were Public Employees under PERA

Under PERA, public employees may form unions.  Mich. Comp. Laws § 423.209.

A public employee is:

> [A] person holding a position by appointment or employment in the
> government of this state, in the government of 1 or more of the political
> subdivisions of this state, in the public school service, in a public or special
> district, in the service of an authority, commission, or board, or in any other
> branch of the public service, subject to [certain] exceptions.

Mich. Comp. Laws § 423.201(e).  Before the newest amendment, at issue in this case,

Michigan law stated, "A person employed by a private organization or entity that

provides services under a time-limited contract with this state or a political subdivision of

this state is not an employee of this state or that political subdivision, and is not a public employee." Mich. Comp. Laws § 423.201(e)(i) (1996).

If employees are not public employees, then they may not unionize under PERA and, rather, are covered by the NLRB.  Subject to limited exceptions, when an activity is "arguably" subject to the provisions of the NLRA, states must defer to the exclusive competence of the National Labor Relations Board and MERC has no jurisdiction.  *Am. Fed'n of State, Cnty., and Fed. Empls. (AFSCME) v. Dep't of Mental Health*, 215 Mich. App. 1 (1995).

The NLRB provides, "The Board, in its discretion, may, by rule of decision or by published rules adopted, . . . decline to assert jurisdiction over any labor dispute involving any class or category of employers, where, in the opinion of the Board, the effect of such labor dispute on commerce is not sufficiently substantial to warrant the exercise of its jurisdiction." 29 U.S.C. § 164(c)(1).  However, "in order to prevent fruitless submissions to the NLRB, it is not necessary for a party to first submit a given case to the NLRB for a determination of the jurisdictional question; rather, a party need only show on the basis of 'rule of decision or by published rules' that the NLRB has or would have declined jurisdiction." *AFSCME*, 215 Mich. App. at 11.

Under the NLRB, the term "employer" does not include "any State or political subdivision thereof" and the term "employee" does not include "any individual employed . . . in the domestic service of any family or person at his home."  29 U.S.C. § 152(2), (3).  Where Congress has chosen not to create a national labor policy in a particular field, the states remain free to legislate as they see fit, and may apply their own views of proper public policy to the collective bargaining process insofar as it is subject to their

10

jurisdiction. *United Farm Workers v. Arizona Agric. Emp. Rel. Bd.*, 669 F.2d 1249, 1257 (9th Cir. 1982).

Defendants argue that home help providers did not qualify as public employees under PERA, that the NLRB arguably had jurisdiction, and therefore the CBA is *void ab initio*. Defendants argue that MQC3 is not a joint employer of the home help providers, despite the numerous provisions in the Interlocal Agreement outlining all of the employer-like responsibilities that MQC3 provides to those workers. However, even assuming, *arguendo*, that MQC3 was not an employer of the home help providers, Defendants have offered no argument against the clear and unambiguous language in the NLRB that explicitly excludes a person employed in the domestic service of a family or person at his home from its definition of an employee. Under the NLRB, either the home help providers are employed by MQC3 and exempt because MQC3 is a public employer, or the home help providers are employed by the individuals in whose homes they are working and are exempt because they are not employees.

Because it is clear from the published rules that the NLRB would have declined jurisdiction, Defendants' argument fails. Additionally, PERA's broad definition of a public employee, before Senate Bill 1018, clearly encompasses the home help providers. Even if one does not consider MQC3 an employer, a public employee under PERA is a "person holding a position by appointment or employment . . . in any other branch of public service." Mich. Comp. Laws § 423.201(e). A home help provider, paid through Medicaid and registered and regulated by a state-created agency, is within this broad umbrella of "public service."

11

Before the changes to PERA at issue in this case, PERA excluded certain employees, specifically, "a person employed by a private organization or entity that provides services under a time-limited contract with this state or a political subdivision of this state" is not a public employee.  As discussed below, this exclusion does not apply to home help providers, making them public employees under PERA.

Because the home help providers were public employees and not subject to the NLRA, MERC had full jurisdiction to allow them to unionize under PERA with Plaintiff as their representative.

Defendants also argue that MQC3 lacked the authority to enter into a collective bargaining agreement because it was not an "employer" under PERA or Michigan case law.  This is simply not true.  MQC3 is a government agency, covered by PERA, and the terms of the Interlocal Agreement specifically state that MQC3 "shall endeavor to carry out the common powers, privileges, and authorities of the Department and the Consortium to provide Personal Assistance Services, including, but not limited to, all of the following: *Providing certain employer-related services, such as those specified in Article VI and functioning as an employer of record.*"  (Interlocal Agreement, § 2.02) (emphasis added).

### 2.    The Interlocal Agreement did not exceed the scope of the Urban Cooperation Act

Defendants argue that the CBA is *void ab initio* because the Interlocal Agreement exceeded the scope of the Urban Cooperation Act.  In Section VI of the Transfer Agreement, entitled "Department Duties," the Agreement provides:

> In order to assure smooth and efficient payment of fees to individual providers on behalf of Consumers in accordance with the requirements of the

12

Home Help Program, the Department will continue the operation of the Provider payroll processing service related to the Home Help Program under 1979 AACS, R 400.1101 to 400.1107 and the IRS Code Section 3504 and Internal Revenue Service Revenue Procedure 70-6.

(Transfer Agreement, IV (2).)  The Transfer Agreement also states, "The Department will not charge the [MQC3] for its continuation under this Transfer Agreement of the payroll processing services that it currently provides for payment for covered Home Help Services."  *Id.* at VI (2).

The Urban Cooperation Act provides:

A public agency of this state may exercise jointly with any other public agency of this state, with a public agency of any other state of the United States, with a public agency of Canada, or with any public agency of the United States government any power, privilege, or authority that the agencies share in common and that each might exercise separately.

Mich. Comp. Laws § 124.504.  The Interlocal Agreement states that MQC3:

[s]hall be responsible for development and maintenance of one or more registries and may assist Consumers in recruiting Providers. [MQC3] shall be responsible for payroll, determining and negotiating of wages and benefits, unemployment insurance, Social Security (FICA), worker's compensation insurance for its employees, to the extend required by law, and for adjusting the grievances of Providers with regard to matters within the control of [MQC3].

(Interlocal Agreement § 6.03.) (emphasis added).

Additionally, the Interlocal Agreement provides, "In carrying out its purposes, the Council may perform, or perform with any Person, as applicable, any power, privilege or authority that the Parties share in common and that each might exercise separately to the fullest extent permitted under by Act 7 and in accordance with applicable law."

(Interlocal Agreement, § 5.01.)

Defendants assert that MQC3 does not have power over the payroll of home help providers because it does not have authority to utilize Medicaid funds (Title XIX) to pay home help providers—only DCH can do that.

Defendants' argument has no merit because it is based on a misreading of the statute.  Their argument leaves out or gives no meaning to the last phrase in the Urban Cooperation Act, which states that the agency "may exercise . . . any power, privilege, or authority that the agencies share in common *and that each might exercise separately*."  Defendants argue that the payroll portion of the Transfer Agreement is void because the DCH and Tri-County Consortium did not share the power to conduct payroll.  While it is true that DCH alone had the power to conduct payroll, DCH was allowed to transfer that responsibility to MQC3 under the Urban Cooperation Agreement.  DCH, as a party to the Interlocal Agreement that created MQC3, had the right to transfer rights and duties to MQC3.  Defendants' reading of the statute is mistaken and does not give the statute the full effect and meaning it was intended to have.

The Transfer Agreement between DCH and MQC3 was a valid exercise of the rights allowed under the Urban Cooperation Act and well within its scope.

### 3.     Senate Bill 1018 is not Merely a Clarification

Defendants argue that the new law is merely a clarification of a possible ambiguity in the old version.  Senate Bill 1018 amended the definition of "public employee" in Michigan Public Employee Relations Act to exclude workers "employed by a private organization or entity . . . who receive a direct or indirect government subsidy in [their] private employment."  Mich. Comp. Law § 423.201(e)(i).  This phrase was

14

absent from the previous version of the bill, where the same provision excluded only "a person employed by a private organization or entity that provides services under a time-limited contract with this state or a political subdivision of this state."

The exclusion in the old version of the law does not apply to home help providers. Home help providers, if employed by a private organization or entity, are employed by the individuals to whom they are providing services. Those people are not an entity that provides services to the state under a time-limited contract. Those people are *receiving* services from the home help providers. The people who receive those services and the home help providers themselves are not providing any services to the State.

The new language encompasses a greater number of people, is significantly broader, and does not limit the exclusion to those employers who provide services to the State. This is not merely a clarification, it is a significant change in the law, and a change that impairs Plaintiff's CBA.

### 4.    Senate Bill 1018 Substantially Impairs the CBA

The first step to determining whether a law violates the Contract Clause is to determine whether the plaintiff has shown that the challenged legislation in fact operates as a "substantial impairment of a contractual relationship." *Energy Reserves Grp., Inc. v. Kansas Power & Light Co.,* 459 U.S. 400, 411 (1983). If the plaintiff meets the threshold of showing substantial impairment, the burden shifts to the state. The state must proffer a "significant and legitimate" public purpose for the regulation warranting the extent of the impairment caused by the measure. *Id.* If the state meets this burden, the court must determine whether the adjustment of the rights and

15

responsibilities of the contracting parties is based on reasonable conditions and is of a character appropriate to the public purpose justifying adoption of the legislation. *Id.* at 412.

A substantial impairment may exist even where there has not been a "total destruction of contractual expectations." *Id.* at 411  If a substantial impairment exists, the "severity of the impairment is said to increase the level of scrutiny to which the legislation will be subjected." *Id.* "When the impaired contract is between private parties normally, we defer to the state's judgment as to the necessity and reasonableness of a measure. *Toledo Area AFL-CIO Council v. Pizza*, 154 F.3d 307, 323 (6th Cir. 1998). But, when the state itself is a contracting party, we will look to see whether the state's self-interest makes such deference inappropriate. *Id.*

In this case, Plaintiff alleges that the new legislation substantially impairs the CBA because it declares the bargaining unit on whose behalf the CBA was negotiated to be "invalid and void" and forbids state officials from recognizing the union as the providers' representative. The entire purpose and essence of the CBA between Plaintiff and the home help providers is that it gave the members a contractual right to be represented by Plaintiff and Plaintiff the contractual right to represent and bargain for its members with MQC3. The new legislation results in a total destruction of the contractual expectations under the CBA. This Court finds that the impairment is substantial because the state has completely deprived the affected workers and their union of the meaningful benefits they negotiated for in their CBA.

Defendants argue that the CBA was not substantially impaired because it was never a valid contract.  Because this Court has already addressed those arguments, it will not address them again here.

Defendants argue that even if the impairment was substantial, Senate Bill 1018 was motivated by a significant and legitimate purpose – to clarify any ambiguity in PERA and prevent parties from taking advantage of such ambiguities in bad faith. Defendants state that their concern is fully supported by the fact that Plaintiff and MQC3 extended the CBA on the same day that the Governor signed Senate Bill 1018 into law.

Defendants argue that any impairment is reasonable in order to prevent parties from taking advantage of possible ambiguities in Michigan law by allowing non-public employees to engage in collective bargaining under PERA.  This Court disagrees.  This Court finds that for a substantial period of time, the State has been willing to tolerate or been unaware of the evils it now claims are associated with the alleged ambiguity in PERA.  The language in the statute that the Michigan Legislature just amended was last amended in 1996 and Plaintiff and MQC3 have had a CBA since 2005.

> If the state has known of, but tolerated, these problems throughout this time, it can tolerate them a bit longer until its contractual obligations expire. If the state's concern is the result of a recent epiphany, it has failed to persuade us that the newly discovered danger of [non-public employees unionizing under PERA] justifies the extreme solution of substantially impairing existing contracts. What is to prevent such epiphanies from serving as the basis for the state to abrogate any other contractual obligation it has undertaken? Certainly, the state is permitted to enact measures to deal with a newly discovered evil. But, the achievement of even a good goal (newly discovered) can normally wait until existing contracts expire.

*Toledo*, 154 F.3d at 326-27.  The State is well within its rights to make amendments to its laws, but it may not make those amendments retroactive and impair contracts

17

already in existence, without a significant and legitimate public purpose.  Defendants in this case have failed to present such a purpose.

Defendants argue that they have no self interest in depriving Plaintiff of funding because the home help providers are not State employees and not on the State's payroll. Home help providers are paid through Medicaid, which is a federal program. Whether or not Defendants have a self interest is immaterial in this case because Defendants' purpose of "clarifying an ambiguity" is insufficient to justify the impairment to existing contracts.

Additionally, Defendants' argument that they are not a party to the CBA and therefore have no contractual obligation to Plaintiff is immaterial.  Defendants are seeking to impose a law, retroactively, that impairs an existing contract in violation of the Constitution.  Defendants need not be a party to the contract they are impairing in order to violate the Contract Clause and for this Court to issue an injunction.[1]

## 5.    MQC3 as a Necessary Party

Defendants also argue that MQC3 is a necessary party and should be joined before this Court can address Plaintiff's claims or grant any injunctive relief.  Defendants argue that MQC3 has a significant stake in the outcome and is necessary to fully litigate the issues and that disposing of the action in its absence may impair or impede MQC3's ability to protect its interests in and under the CBA.  Plaintiff argues that MQC3 is not

---

[1] At the hearing on June 20, 2012, Defendants argued that the Interlocal Agreement could be terminated "at any time" and that any preliminary injunction would bind Defendant DCH in its own contract with the Tri-County Consortium.  This Court notes that DCH has attempted to terminate the contract, the Tri-County Consortium has not agreed, and the Interlocal Agreement is scheduled to expire on April 11, 2013, pursuant to § 8.02 of the Interlocal Agreement.

currently threatening to enforce Senate Bill 1018 and so they need not be added at this time to afford Plaintiff relief.

While it is true that MQC3 is the party Plaintiff contracted with in the CBA, MQC3 is not currently threatening to breach its contract with Plaintiff or using the new law to deny any of its contractual obligations.  At this time, Plaintiff has no case or controversy with MQC3.  The Defendants that Plaintiff sued are the correct defendants in this case because they are the parties that are implementing the unconstitutional state law.  While MQC3 may need to be added as a party at some point going forward, it is not a necessary party to grant Plaintiff a preliminary injunction against Defendants at this stage.

**B.     Irreparable Harm**

A plaintiff must always show irreparable harm before a preliminary injunction may issue.  *Friendship Materials, Inc. v. Michigan Brick, Inc.*, 679 F.2d 100, 104 (6th Cir. 1982).  "The basis of injunctive relief in the federal courts has always been irreparable harm and inadequacy of legal remedies."  *Sampson v. Murray*, 415 U.S. 61, 88 (1974) (citations omitted).  Monetary damages, however substantial, do not constitute irreparable harm.  *Id.* at 90.

Irreparable injury based on financial loss alone will only be found where the potential economic loss is so great as to threaten the existence of the movant's business or "financial ruin" will result.  *Performance Unlimited, Inc. v. Questar Pub., Inc.*, 52 F.3d 1373, 1382-83 (6th Cir. 1995).  If money damages can compensate the moving party, a preliminary injunction is not appropriate.

19

Courts have ruled that irreparable harm is caused to a union where withdrawal of recognition would cause erosion of support from the union; cause impotence of the union; make it difficult to enforce union rules and regulations, and; make it difficult to preserve the collective bargaining process. *Glasser v. Heartland Health Care Ctr.*, 333 F. Supp. 2d 607, 615 (E.D. Mich. 2003) (Hood, J.); *Bloedorn v. Francisco Foods,* 276 F.3d 270, 298–99 (7th Cir.2001). The loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury. *Elrod v. Burns*, 427 U.S. 347, 373 (1976).

In this case, Plaintiff argues that it will suffer irreparable harm if an injunction is not issued. Plaintiff argues that a mandate that public officials "shall not recognize" Plaintiff as a union representative will cause the union support to erode before final relief can be granted. Additionally, by depriving Plaintiff most of its operating income, Plaintiff would be unable to protect its members' interests during the current budget cycle and the crucial period before the November 2012 general election.

Plaintiff submitted a declaration of Bob Allison, Director of Government Affairs for Plaintiff. Allison states that Defendants' actions strip Plaintiff of its contractual right to act as the providers' representative, to enforce the contract through the grievance process, and leaves the providers unprotected. (Allison Decl. ¶ 31.) Allison also states that support for Plaintiff as the union representative will erode because of the State's "unilateral repudiation of the 2009-2012 CBA, substantially weakening [Plaintiff's] ability to serve as the providers' representative." (*Id.* at ¶ 32.) Furthermore, the Michigan Legislature is currently considering a new budget that could considerably affect the hours and wages of the home help providers, and without an injunction, Plaintiff will "not

20

be able to effectively represent the providers in the legislative process." (*Id.* at ¶ 34.)

Plaintiff argues that automatic withholding at the time paychecks are prepared is by far the most convenient and effective manner for union members and agency fee payers to pay their dues and fees and for Plaintiff to receive those funds. (*Id.* at ¶ 35.) Plaintiff will have to spend a significant amount of time and money attempting to collect dues and fees in a different way and the deprivation of its union dues will hamper Plaintiff's activities, result in an immediate drop in revenue and resources available to dedicate to advocacy, and therefore, cause the loss of the support of its members and its First Amendment freedoms. *See Frye v. Specialty Envelope, Inc.*, 10 F.3d 1221, 1226-27 (6th Cir. 1993) (holding where the employer continued to withhold recognition from the union, that a real danger that employee support would erode to such an extent that the union could no longer represent those employees and at that point, any final remedy would be ineffective).

Additionally, Plaintiff's "representational and First Amendment activities on behalf of the providers would be significantly chilled by the temporary loss of provider dues and fees, and [Plaintiff's] receipt of those dues and fees would not undo the damage resulting from [Plaintiff's] inability to represent its members' interests in the present." (Allison Supplemental Decl. ¶ 18.)

Defendants do not address the non-monetary effects that Plaintiff states will result without an injunction, arguing solely that Plaintiff cannot show irreparable harm because it cannot show that it will suffer "financial ruin" absent injunctive relief. Plaintiff admits that the CBA at issue provides only 55% of Plaintiff's revenue and Plaintiff does not allege that it will be unable to continue its operations only that it will have to lay off

21

staff.  Additionally, Defendants argue that Defendants will reimburse Plaintiff should it prevail and that the dues are currently being placed in an escrow fund, so there is no irreparable harm.

This Court agrees that Plaintiff here has not adequately alleged that financial ruin will result without an injunction.  In this case, however, Plaintiff argues that the harm is not purely financial.  Plaintiff argues that Defendants have completely deprived Plaintiff and the affected workers it represents of a meaningful benefit they negotiated for in their CBA.  By mandating that state officials refuse to recognize Plaintiff as a union representative and refuse to withhold union dues and fees, Plaintiff will be irreparably harmed by being deprived its contractual rights, its ability to advocate and bargain for its members, and the loss of revenue to operate effectively and exercise its First Amendment rights during an important time before a new budget is passed and an election is held.

In this case, the Court finds that money damages would not compensate Plaintiff for its alleged harm and Plaintiff has shown the need for an injunction.  *See Glasser*, 333 F. Supp. 2d at 615 (finding an injunction appropriate where withdrawal of recognition would cause erosion of support from the union; cause impotence of the union; make it difficult to enforce union rules and regulations and; make it difficult to preserve the collective bargaining process).

### C.    Harm to Others

Plaintiff argues that the issuance of an injunction will not cause any harm to others.  Additionally, Plaintiff states that the 98% of the home help providers who are voluntary members of the union will be harmed if an injunction is not issued.

22

Defendants argue that not all home help providers are eager to reap the benefits of union representation and issuing an injunction or TRO before hearing from those individuals will harm their interests.  Plaintiff states that the small group of non-members would not suffer substantial harm from continuing the status quo that has been in effect for six years.

The Sixth circuit has held that "if the plaintiff shows a substantial likelihood that the challenged law is unconstitutional, no substantial harm to others can be said to inhere its enjoyment." *Bays v. City of Fairborn*, 668 F.3d 814, 825 (6th Cir. 2012) (internal citation omitted).

### D.    Public Interest

Defendants argue that the public interest is expressed through its elected representatives in the Legislature. If this Court grants a temporary restraining order or a preliminary injunction, it will thwart the will of the People of Michigan in favor of a narrow private interest. Moreover, there is a significant public interest in ensuring that all Medicaid monies reach the Medicaid recipient and the home help provider the recipient selects and portions of those Medicaid payments should not be diverted to SEIU.

Plaintiff argues that it is in the public interest to stop Defendants from violating the Contract Clause and impairing Plaintiff's contractual expectations.  *See Bays*, 668 F.3d at 825 ("It is always in the public interest to prevent violation of a party's constitutional rights.").

The factors for issuing a preliminary injunction weigh heavily in Plaintiff's favor. Plaintiff has shown a likelihood of success on the merits, irreparable harm, no harm to others, and that an injunction is in the public interest.  This Court GRANTS Plaintiff's

23

motion for a preliminary injunction.

      **E.**    **Posting a Bond**

      Federal Rule of Civil Procedure 65(c) states, "The court may issue a preliminary injunction or a temporary restraining order only if the movant gives security in an amount that the court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined or restrained."  Fed. R. Civ. P. 65(c).

      If a preliminary injunction is granted, Defendant DCH will be forced to continue to deduct union dues and remit them to Plaintiff.  Defendants argue that if Defendants prevail, they will not be able to recover those funds and so a bond should be set in an amount sufficient to cover Defendants' interests.  Defendants state that the dues remitted to Plaintiff are approximately $500,000 per month and over the course of the nine months from now until the CBA expires in February 2013, Defendants will remit $4.5 million to Plaintiff and Plaintiff should be required to post a bond in that amount to "reimburse State Defendants for potentially improper payments."

      Defendant DCH is responsible for withholding the union dues and fees and delivering them to Plaintiff under the Transfer Agreement and CBA.  That money, however, does not belong to Defendants.  It is money from Medicaid that would be paid to the home help providers and they have authorized Plaintiff to deduct the union dues from those paychecks.  Defendants act as the entity in charge of payroll, but they have no rights, at any time, to the money.

      Rule 65 limits the amount of the security required to the amount proper to pay the costs and damages *sustained by any party* found to have been wrongfully enjoined or restrained.  In this case, Defendants have not alleged that they would sustain any costs

24

or damages if an injunction is ordered.  In fact, the legislative analysis of Senate Bill 1018 states, "The bill would have no fiscal impact on State or local government."

Defendants' request for a bond is DENIED.

**F.   The CBA Extension**

Defendants argue that it would be inequitable to force State Defendants to deduct union dues past the original September 20, 2012 expiration date of the CBA. Defendants argue that they were not parties to the extension, did not agree to it, and that Plaintiff entered into the extension in bad faith.

In 2009, Plaintiff and MQC3 entered into a CBA that would be in effect until September 20, 2012.  On October 15, 2009, MQC3 and Plaintiff extended the CBA so that it would be in effect until November 15, 2012.  Then, on April 9, 2012, MQC3 and Plaintiff signed an agreement extending the CBA to February 28, 2013.  This extension agreement happened after the legislature had enacted the new law and on the same day that the Governor signed it.  Defendants argue that when Plaintiff and MQC3 approved the extension, they knew or reasonably should have known that the Senate Bill had been signed into law and would soon render their bargaining unit unlawful.

Defendants argue that this action makes Plaintiff's hands unclean and shows that the extension was done in bad faith.  This argument is without merit.  Plaintiff and MQC3 were well within their rights to enter into an extension of the CBA and to exercise the powers they rightfully possessed in the manner they deemed best for establishing and maintaining a large enough and stable workforce of qualified home help providers, which was the purpose behind the Interlocal Agreement that created MQC3. Additionally, Defendants ignore the fact that the first extension, moving the expiration

25

date of the CBA to November 15, 2012 occurred on October 15, 2009, years before Senate Bill 1018 was passed and during a time in which DCH had a representative on the MQC3 Board.

Defendants also argue that MQC3 did not have a quorum to extend the CBA, as required under the interlocal agreement.  Under the interlocal agreement, MQC3 shall have a board that consists of 11 members and "a majority of the Council Board members appointed and serving shall be required to constitute a quorum for the transaction of business. The Council Board shall act by a majority vote at a meeting at which a quorum is present.  A quorum shall be necessary for the transaction of business by the Council Board."  (Interlocal Agreement, § 4.05.)

Defendants state, "A quorum would be six members of the Board, unless there were vacancies that were not appointed and serving."  (Def. Resp. ¶ 153.)  The meeting minutes that Defendants attached to its motion, however, clearly indicates that there were eight active board members at the time and a quorum was 5.  There were five board members at the April 9, 2012 meeting and four of those present voted for extending the CBA (one person abstained).

Defendants' argument that a quorum was not present has no merit.  Additionally, whether the board members knew the legislature had voted on Senate Bill 1018 is immaterial.  The Interlocal Agreement and the CBA both give MQC3 the rights to enter into contracts, collectively bargain, and amend the collective bargaining agreement. Plaintiff and the MQC3 followed the protocol required by the contracts in place and the extension occured one day before the new law took effect, making it a binding contract that the law cannot retroactively impair without violating the Contract Clause.

26

Defendants argue that Plaintiff and MQC3 extended the CBA "without any representation of State Defendants on the MQC3 Board and without and input or consent from State Defendants."  (Farrell Aff. ¶ 13; Def. Resp. ¶ 135.)  Defendants ignore, however, the express language of the Interlocal Agreement that states that the MQC3 board shall be made up of eleven people: one member appointed by MQC3, the Director of DCH or his/her designated representative, the Director of the Family Independence Agency or his/her representative, and eight members appointed by the Governor of Michigan and removable at his will.

The Governor of Michigan and the Director of DCH are named as defendants in this case.  Between those two Defendants, the Interlocal Agreement provided that they were responsible for appointing nine of the eleven board members.  Defendants' argument that they had no representation on the board and no control or consent over its actions, if true, is due to their own choices not to exercise their rights under the Interlocal Agreement to sit on or appoint people to the board.  The State Defendants had and continue to have the opportunity to participate in the MQC3 board and its actions.

## IV.    Conclusion

For the foregoing reasons, Plaintiff's motion for a temporary restraining order and preliminary injunction is GRANTED.


                                 s/Nancy G. Edmunds
                                 Nancy G. Edmunds
                                 United States District Judge

Dated:  June 21, 2012

27

I hereby certify that a copy of the foregoing document was served upon counsel of record on June 21, 2012, by electronic and/or ordinary mail.

s/Carol A. Hemeyer
Case Manager

28